1 Roger J. Peven
Kailey E. Moran
2 Kimberly A. Deater
FEDERAL DEFENDERS OF EASTERN WASHINGTON AND IDAHO
3 10 North Poste, Suite 700
Spokane, Washington 99201
4 (509) 624-7606

5 Attorneys for Defendant

6 UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
7 (HONORABLE JUSTIN L. QUACKENBUSH)

8 UNITED STATES OF AMERICA,          )
                                     )
9          Plaintiff,                )        CR-11-042-JLQ
                                     )
10    vs.                            )        DEFENDANT'S SENTENCING
                                     )        MEMORANDUM
11 KEVIN WILLIAM HARPHAM,            )
                                     )
12          Defendant.               )
                                     )
13 TO:    MICHAEL C. ORMSBY, UNITED STATES ATTORNEY
        THOMAS O. RICE, ASSISTANT UNITED STATES ATTORNEY
14      JOSEPH H. HARRINGTON, ASSISTANT UNITED STATES ATTORNEY

15      KEVIN WILLIAM HARPHAM, through undersigned counsel,

16 moves the Court to impose a sentence of 27 years imprisonment to be

17 followed by a life term of supervised release.  This request is based upon

18 the entirety of the files contained herein as well as the following

19 Sentencing Memorandum.

20      *Discussion*

21      A sentence of 27 years is sufficient, even in light of the offense,

22 given that the guidelines sentencing range is much lower than 27 years,

23 and given Mr. Harpham's background, family ties, complete lack of

24

Defendant's Sentencing Memorandum
                              1

1  criminal history, service to his country, the fact that no one was harmed,

2  and the lower sentences received recently by defendants - some with

3  significant criminal histories - in similar or more serious cases across the

4  nation.

5  **I.    18 U.S.C. §3553(a)**

6          Over the past several years, the Supreme Court has given judges

7  the power to impose sentences that are not greater than necessary to

8  satisfy the statutory purposes of sentencing and to consider all of the

9  characteristics of the offender and circumstances of the offense in

10  fashioning the appropriate sentence. *See United States v. Booker*, 543

11  U.S. 220 (2005); *Rita v. United States*, 551 U.S. 338 (2007); *Gall v.*

12  *United States*, 128 S. Ct. 586 (2007); *Kimbrough v. United States*, 552

13  U.S. 85 (2007).  In this case, the guidelines as well as the other

14  sentencing factors all support Mr. Harpham's request for a sentence of

15  27 years.

16          The statute governing sentencing requires the district court to

17  "impose a sentence sufficient, but not greater than necessary, to comply

18  with the purposes set forth in paragraph (2)" of that provision. 18 U.S.C.

19  § 3553(a). Those purposes are:

20          (2) the need for the sentence imposed—

21          (A) to reflect the seriousness of the offense, to promote respect for

22          the law, and to provide just punishment for the offense;

23          (B) to afford adequate deterrence to criminal conduct;

24

Defendant's Sentencing Memorandum

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

In fashioning a sentence that complies with the "overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to achieve the goals of sentencing," *Kimbrough*, 552 U.S. 85, 128 S. Ct. at 570, the judge must consider a broad range of factors including:

- The kinds of sentences available and the sentencing guidelines range.

- Any pertinent policy statements.

- The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

- The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(3)-(7).

## A.     Nature and Circumstances of the Offense

Mr. Harpham has stipulated to the facts outlining the offense as set forth in the plea agreement. However, there are other facts that the Court should consider which were not included or not discussed at length in the plea agreement.

*Defendant's Sentencing Memorandum*

1

*1.    The device was never detonated.*

2    On January 17, 2011, the destructive device was discovered in a

3    backpack along the MLK parade route.  The backpack was discovered by

4    three young men - Brandon K., Mark S., and Sherman W. - all of whom

5    were working for the city that day.  According to the discovery, the three

6    found the backpack at about 9:22 a.m.  At first they thought the

7    backpack might contain something of value so they picked it up and

8    placed it on the nearby bench for better access to the insides.  According

9    to Brandon K, the other two were wrestling over the backpack.  Once

10    they opened the backpack, they saw wires and at first believed the pack

11    to contain stereo equipment.  However, upon further investigation, they

12    found that the wires were attached to something wrapped by duct tape.

13    At this point they grew suspicious and contacted their supervisor and

14    911.

15    According to CAD reports, the first 911 call was received at 9:26

16    a.m. *Discovery* at 10006.  The first officers arrived on scene at 9:41 a.m.

17    - approximately 20 minutes after the initial discovery of the backpack.

18    While officers began diverting vehicle traffic at about 9:47 a.m, foot

19    traffic in the area was not prohibited until 11:12 a.m. - almost 2 full

20    hours after the pack was discovered.  All the while, the backpack and

21    device remained sitting in the open and possibly viable.

22    The device was not detonated before it was discovered.  More

23    importantly, even after the device had been discovered, there was still

24

Defendant's Sentencing Memorandum

1   ample time to detonate it, if that had actually been the intent of Mr.

2   Harpham. The fact remains that the device was not detonated and

3   therefore, no one was injured.

4           2.    *The placement of the backpack and possible effects of
                   device functioning.*

5

6       As the Court is aware, the government created a demonstration

7   using three separate "mock-ups" of the device that were subsequently

8   staged and test fired.  However, as the Court is also aware, the defense

9   has argued that neither the mock-ups nor the test fires were accurate

10  representations of the device or its placement.  As a result, these

11  demonstrations do not represent what would actually have happened in

12  the event that the device functioned.  Instead, these demonstrations

13  were staged for the purposes of persuading a jury by using a hypothetical

    worse case scenario.

14

15      In all of the test shots performed by the government, the device

16  was staged so that it was elevated and braced with the open end of the

17  barrel facing directly towards the replicated targets.  However, in

    reality, the device was found in a backpack, on the ground, leaning

18  against a brick wall behind a metal trash can and metal bench with no

19  evidence whatsoever that the barrel was facing directly out to the street.

20       According to the young men who found the device, it was inside of

21  a backpack which was on the ground, leaning against a brick wall behind

22  a metal trash can and behind a metal bench.  There were some minor

23  discrepancies in the witness statements about the placement. Brandon

24

Defendant's Sentencing Memorandum

1     K. stated that the backpack was wedged between the wall and trash can,

2     *See Exhibit A.*, while Mark S. stated it was simply leaning against the

3     wall. *See Exhibit B.*

4         Further, when the young men opened the backpack, they did not

5     see the barrel opening. Based upon the pictures they took of the open

6     backpack and their descriptions of what they saw, the barrel was not

7     facing up or out to any side. *See Exhibits C, D, and E.* In other words, it

8     would appear the barrel was situated so that the mouth was pointing in

9     a downward position. *See Exhibits F and G.*

10        However, the government did not produce a demonstration with

11    these criteria. According to defense expert, Jerry Taylor, one of the

12    problems with the government's staging of the demonstration was "...

13    that elevating the device and bracing it for the tests was also not in

14    keeping with the position of the original device as this produced a less

15    than true effect of having a device function at ground level."

16       Mr. Taylor went on to say, "Elevation allowed the [government's

17    demonstration] functioning device to disperse fragmentation in a large

18    spherical shape whereas having the device function as it was originally

19    positioned or discovered would severely restrict the dispersment [sic] of

20    the fragmentation by causing it to be at or near ground level and

21    restricted by the bolted down walls, benches and trash cans." Taylor's

22    September 1, 2011 Report.

23       Clearly, any fragmentation that may have occurred if the device

24

Defendant's Sentencing Memorandum

had functioned would have been far more limited than that portrayed by the staging of the demonstration.

> 3.    *The video/pictures were taken after the device had been discovered.*

Authorities found Mr. Harpham's camera and retrieved deleted video. This video depicted Mr. Harpham and other individuals attending the parade on January 17, 2011. Some of the individuals depicted were African-American and the inference that seems to be drawn is that these were individuals Mr. Harpham was targeting. However, the video was shot after the device had been discovered and after the parade participants had been diverted to the IMB (Opera House) building. Therefore, the inference that the videos depict intended targets is not accurate.

## B.    History and Characteristics of Mr. Harpham

The fact that Mr. Hapham has the support so many good people, despite his crime, speaks volumes. See PSIR, pgs 15 - 17 and *Exhibits H, I, J and K*. While all of these individuals have had different relationships with Mr. Harpham, they all describe him in the same manner - as a good neighbor, friend, son, brother and nephew. He is consistently described as a kind-hearted and gentle soul who would go to any length to help someone in need.

His neighbor and tenant, Mr. Roy Hinson, describes Mr. Harpham as the son he never had. Mr. Hinson is severely overweight and suffers from a plethora of health problems. He lives in a very rural area and has

Defendant's Sentencing Memorandum

1    no transportation.  Yet, Mr. Harpham always took care of him.  Mr.

2    Harpham checked in on him every day, purchased his groceries, made

3    improvements on the house at Mr. Hinson's request, and took him to all

4    of his doctor's appointments, many of which were in Spokane -

5    approximately 1.5 hours away.   Mr. Harpham never asked for anything

6    in return, he simply took it upon himself to help someone in need.

7        Mr. Harpham's father Bill suffered a stroke in late 2009 and

8    needed round-the-clock care once he returned home.  According to Bill,

9    Kevin Harpham volunteered, without hesitation, to care for his father.

10   Mr. Harpham moved in with his father and bathed, clothed, and fed him

11   for many weeks.  Even before the stroke, Mr. Harpham was routinely at

12   his father's home to help with chores and to check on his father's well-

13   being.

14       Mr. Harpham's sister, Carmen Harpham also describes her brother

15   as a caretaker.  When Ms. Harpham was in high-school, she recalls an

16   incident where her father was verbally and emotionally abusive to her

17   and to her brother.  Ms. Harpham recalls that her brother left the house

18   shortly after the incident, but that he came to check on her first to make

19   sure she would be alright in his absence.

20       Mr. Harpham's mother, Lana Harpham, describes her son as kind,

21   gentle and loving.  She stated that to her knowledge he has never

22   harmed another living creature.  She recalls that Mr. Bill Harpham was

23   sometimes verbally and emotionally abusive to Kevin, but that Kevin

24

Defendant's Sentencing Memorandum

1    still cared for his father.  This is also evidenced by the fact that Mr.

2    Harpham nursed his father back to health after the stroke.

3        Mr. Harpham's friend of over twenty years, Carlin Gray - who is

4    currently stationed with the military in Germany - describes Mr.

5    Harpham as a brilliant yet quiet man, who was always well liked by his

6    peers.

7        Mr. Harpham has, until this incident, always been a law-abiding

8    citizen who acted responsibly in all matters.  In fact, for most of his 36

9    years on this planet, he lived an exemplary life. He cared for others, he

10   worked hard and paid his debts and he served his country through

11   military service where he received an honorable discharge.

12   **C.   Seriousness of the Offense, Respect for the Law, Just
         Punishment, Deterrence and Unwarranted Sentencing
13       Disparity.**

14       The sentence must be sufficient but, not greater than necessary to

15   reflect the seriousness of the offense in conjunction with a consideration

16   of the need for respect for the law and just punishment, deterrence and

17   unwarranted sentencing disparity.

18       Twenty-seven years is a very, very long time in anyone's life, but

19   for someone who will be spending that time in prison, it is an eternity.  If

20   sentenced to twenty-seven years, Mr. Harpham will be approximately 64

21   years old when released.  Although Mr. Harpham has admitted to

22   conduct that can be described as despicable, the fact remains, he did not

23   hurt a soul because, whatever his reasons may have been at the start, in

24

Defendant's Sentencing Memorandum

9

the end he did not detonate the device.  Given his past and his consistent character for peacefulness, it is not surprising that the device was never detonated.

Moreover, a sentence of twenty-seven years is more severe than sentences imposed in other recent cases in this country.  In fact, in at least one of these cases the defendants had significant criminal history. In *United States v. Cromitie, et al.*, CR-09-558-CM, four co-conspirators were charged in an eight-count indictment with one count of Conspiracy to Use Weapons of Mass Destruction, three counts of Attempted Use of a Weapon of Mass Destruction, one count of Conspiracy to Acquire and use Anti-Aircraft Missiles, one count of Attempt to Acquire and use Anti-Aircraft Missiles, one count of Conspiracy to Kill Officers and Employees of the United States and one count of Attempt to Kill Officers and Employees of the United States.  The penalties for the Anti-Aircraft charges ranged from a 25-year mandatory minimum to life.

After trial, the defendants were convicted of all eight counts, yet they were all sentenced to 25 years, two years less than Mr. Harpham requests.  *Exhibits N and O.  See also* http://blogs.wsj.com/metropolis/2011/109/07/25-year-sentence-for-fourth-brox-bomb-plotter/

In yet another case, a man who planned to blow-up a Dallas skyscraper, and who literally pushed - what he thought was - the detonation button received a 24-year sentence pursuant to an

11(c)1(C)plea agreement.  *See Exhibits P, Q and R.*

Moreover, the guideline sentence in this case is 97 - 121 months, less than half of the sentence Mr. Harpham seeks.[1]

**II.    Conclusion**

A 27-year term of imprisonment, followed by a life term of supervised release, is sufficient, but not greater than necessary to comport with the sentencing directives set forth above.  Mr. Harpham, who has lived an exemplary life until recent events, who has no criminal history, who has been a good son, brother, neighbor, soldier and friend deserves to have this Court take into account the good works that account for the majority of his life.  He accepts responsibility for his crime and a sentence of 27 years is just punishment for his misdeeds.

Dated:       November 21, 2011

Respectfully Submitted,

*s/Kailey E. Moran*
WA 27857
/s *Roger J. Peven*
WA 6251
*s/ Kimberly A. Deater*
WA 28230

---

[1]This sentence is based on an offense level of 30 and a criminal history category of I.  Although the PSIR recommends a 3-level increase based on a cross-reference to section 2A2.1 of the guidelines, this cross-reference is inapplicable and specifically rejected by the defendant in the plea agreement.

Defendant's Sentencing Memorandum

11

Attorneys for Kevin William Harpham
Federal Defenders of
Eastern Washington and Idaho
10 North Post, Suite 700
Spokane, Washington 99201
(509) 624-7606
(509) 747-3539 fax
Kim_Deater@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2011, I electronically filed the foregoing under seal and served via email such filing to the following: JOSEPH H. HARRINGTON, Assistant United States Attorney, Thomas O. Rice, Assistant United States Attorney, and Michael Ormsby, United States Attorney.

*s/ Roger J. Peven*
WA 6251
*s/Kailey E. Moran*
WA 27857
*s/ Kimberly A. Deater*
WA 28230
Attorneys for Kevin William Harpham

Defendant's Sentencing Memorandum

12